**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

**DEREK SLOANE,**

                                    **Plaintiff,**                    **12-CV-25(Sr)**
**v.**

**BORAWSKI, et al.,**

                                    **Defendants.**


<u>**DECISION AND ORDER**</u>

            Pursuant to 28 U.S.C. § 636(c), the parties have consented to have the

undersigned conduct any and all further proceedings in this case, including entry of final

judgment.  Dkt. #36.


            Plaintiff filed this *pro se* action on or about January 11, 2012, seeking

relief pursuant to 42 U.S.C. § 1983 and state common law.  Dkt. #1.  By Decision and

Order filed August 30, 2012, United States District Judge David G. Larimer ordered that

several of plaintiff's claims be dismissed.  Dkt. #6.  Presently pending before this Court

is defendants' motion for summary judgment.  Dkt. #27.


            Plaintiff claims that on March 22, 2011, while an inmate housed at the

Attica Correctional Facility, defendants Correction Officers Bryniarski and Mulla used

excessive force against plaintiff and filed a false misbehavior report.  Plaintiff further

alleges that defendant Lieutenant Borawski denied him due process in connection with

a Tier III disciplinary hearing resulting from the March 22, 2011 incident.  Finally, plaintiff

alleges that defendant Jennings violated his rights by denying him adequate medical treatment after the alleged excessive use of force incident.

## FACTUAL BACKGROUND

In his complaint, plaintiff alleges that on March 22, 2011, he was walking to the mess hall, when Correction Officer Mulla and Correction Officer Bryniarski told him to place his hands on the wall and then began to yell at him, slam his head into the wall and kick, punch and hit him with sticks. After a bell sounded, more unidentified correction officers came running, took him downstairs, and "jump[ed] him again." Plaintiff claims that his "head [was] busted," and that he suffered from cuts over his left eye and chin, broken ribs, an ankle fracture and a back injury. Dkt. #1, ¶¶ 8-10. Plaintiff maintains that notwithstanding the fact that he was bleeding heavily and informed Nurse Jennings of the extent of his injuries, the only treatment he received was a bandage for his head. Thereafter, plaintiff alleges, he was sent to the "box." *Id.* at ¶¶ 11, 17-19.

Plaintiff further alleges defendant, Lt. Borawski denied him due process at the Superintendent's Hearing held with respect to the misbehavior report issued following the alleged excessive use of force on March 22, 2011. Dkt. #1, ¶30. Specifically, plaintiff alleges that defendant Lt. Borawski "fix[ed] the hearing by denying plaintiff's [sic] his witnesses, denying his assistant, misprison of felony, conspiring to violate plaintiff's federal, statutory rights by assaulting [sic] him without cause, creating a false misbehavior report, preparing false physical evidence after the attack. [i]n

2

addition, submitting false statements to the prison, offering a false instrument for filing.

and [sic] denying him a fair and impartial hearing." *Id.*

In support of the instant motion, defendants rely on the affidavit of

defendant Correction Officer Jeffrey Bryniarski. Dkt. #27-4. As it relates to the March

22, 2011 incident alleged in the complaint, defendant Bryniarski states in his affidavit,

> [o]n March 22, 2011, I was working as a CO in Attica
> Correctional Facility, where my duties consisted of care,
> custody and control of the inmates. On the above date, at
> approximately 4:10 pm, while inmates were lined up for
> chow, I ordered inmate Sloane, #07-A-1140, from 22-04-T,
> to step out of line, because he had both hands in his
> pockets. This is a security concern due to weapons and
> other contraband that may be kept inside of pockets and
> used to harm staff and other inmates. Moreover, all inmates
> housed at Attica are informed in the Inmate Orientation
> Guideline Manual that their hands "will be kept out of
> pockets or waistbands of pants while in formation." . . . As I
> began to talk to the plaintiff, he then turned, unprovoked, and
> swung to punch me with his closed right fist.

Dkt. #27-4, ¶¶4-5 (internal citations omitted). Thereafter, defendant Bryniarski states

that with the assistance of defendant Mulla, force was used to subdue plaintiff. *Id.* at

¶6. Specifically, defendant Bryniarski described, "I assisted in subduing the inmate by

grabbing his right arm and sweater with both of my hands and forced him into the wall

onto the floor. I maintained control of his right arm with both of my hands while the

mechanical restraints were applied." *Id.* at ¶7. A Use of Force Report was generated

and plaintiff was issued a Misbehavior Report.

Defendant Correction Officer Joseph Mulla also submitted an affidavit in support of the instant motion for summary judgment wherein he describes that on March 22, 2011 at approximately 4:10 p.m. he "witnessed plaintiff, unprovoked, attempt to swing and punch CO Bryniarski with a closed fist." Dkt. #27-6, ¶5. Moreover, defendant Mulla states, "[t]o assist Bryniarski, I gained control of the inmate's left arm with both of my hands and forced him to the wall and then onto the floor. I applied the mechanical restraints to the non-struggling inmate." Defendants Bryniarski and Mulla both state that plaintiff was subsequently moved to the lobby without incident. Both defendants Bryniarski and Mulla maintain that the force used in connection with this incident was only what was necessary to regain control of plaintiff. Dkt. #27-4, ¶9; Dkt. #27-6, ¶6.

In sharp contrast, in his counter-statement filed in opposition to defendants' motion for summary judgment, plaintiff maintains,

> on March 22, 2011 Plaintiff was infact assaulted by the defendants on that date and time. For no apparent reasons, or justified reason. [sic]  Plaintiff was inroute to the mess-hall, as such, a you not you, the ball-head one [sic]. Step over here. Place your hands on the wall. Didn't I tell you about that shit being in your pants?  I informed him that I don't [sic] have an [sic] belt?  He stated in his own words: are you cazy [sic] or insane?  He then placed his hands on my neck and started pushing my head against the wall by the lock-box. He looked at me with this ugly face. And stated to the other C.O., Officers. Take him down. That's when they all started all [sic] assaulting me for no reasons.

Dkt. #32, ¶13. Plaintiff does not dispute that "all inmates housed at Attica are informed in the Inmate Orientation Guideline Manuel that their hands 'will be kept out of pockets

or waistbands of pants while in formation.'  This is a security concern due to weapons

and other contraband that may be kept inside of pockets and used to harm staff and

other inmates."  Dkt. #27-2, ¶15.


There is no dispute that immediately following the incident, plaintiff was

taken to the Attica Emergency Room and was seen by defendant Nurse Jennings.

Plaintiff claims that he was not "examined" by Nurse Jennings.  Rather, plaintiff states,

"the only thing that she did was put a bandage on my head and sent [sic] to the box.

She did not examining [sic] me at any time that I was in the medical office or sent to the

box no medical care was offered or given."  Dkt. #32, ¶¶17 and 19.  In her affidavit

submitted in support of the instant motion for summary judgment, defendant Helen

Jennings states, based on her review of the inmate injury report and the physical

examination reports included with the use of force report all dated March 22, 2011,

> On March 22, 2011, at approximately 4:25 PM, I examined
> the patient in the Attica Emergency Room.  At that time, I
> noted a 2½ inch laceration to the top of his left head, a ½
> inch laceration to the left eye brow and a small abrasion on
> the left chin.  I then cleaned the laceration on the top of the
> head and the left brow with sterile water and applied steri-
> strips and dermaband.

Dkt. #27-5, ¶5.


On March 22, 2011, defendant Correction Officer Mulla completed an

Inmate Misbehavior Report concerning the above-described incident.  Plaintiff Sloane

was charged with the following violations:  100.11 attempted assault; 104.11 violent

conduct; 104.13 disturbing the order of the facility, 107.10 interference with an

employee.  Dkt. #27-4, p.5.  In the Inmate Misbehavior Report, defendant Mulla

described the incident as follows:

> On the above date and approximate time inmate Sloane
> 07A1140 came down the stairs with the 22 co. inmates going
> to chow.  He had both of his hands in his pockets and C.O.
> Bryniarski ordered him to step out of the line.  As C.O.
> Bryniarski began to talk to him he swung at C.O. Bryniarski
> with his right hand in a closed fist.  At this time it became
> necessary to use force.  (See use of force report)
> Inmate Sloane was then escorted to the infirmary by
> uninvolved staff with no further incident.

Dkt. #27-4, p.5. Defendant Borawski was assigned to conduct the Tier III hearing.  Dkt.

#27-3, ¶5.  The hearing began on March 25, 2011 and concluded on March 28, 2011.

*Id.* at ¶8.  In an affidavit submitted in support of the instant motion, defendant Borawski

states that when the hearing first began he explained to plaintiff that he could call

witnesses on his behalf, that nothing he said in the hearing would be used against him

and that he could submit documentary evidence.  *Id.* at ¶9.  After confirming that plaintiff

understood these rights, defendant Borawski confirmed that plaintiff had been served

with a copy of the Misbehavior Report on March 23, 2011.  *Id.* at ¶10.  Moreover,

defendant Borawski confirmed that plaintiff had been provided with the opportunity to

select an employee hearing assistant.  As reflected in the Assistant Selection Form

(Dkt. #27-3, p.10), plaintiff refused to sign the form and waived his right to an employee

hearing assistant.  During the hearing, plaintiff requested that Acting Attica

Superintendent Bradt serve as his hearing assistant, such request was denied.  Dkt.

#27-3, ¶10.

During the hearing, plaintiff indicated that he wished to call inmate Booker, RN Jennings, then Acting Superintendent Bradt, CO Mulla, five unknown inmates and an unknown officer to testify at the hearing. *Id.* at ¶11. Defendant Borawski denied plaintiff's request to call then Acting Superintendent Bradt as a witness because he did not have knowledge of the event. *Id.* In addition, defendant Borawski denied plaintiff's request with respect to the unknown witnesses because plaintiff was unable to provide any information to identify the individuals. *Id.*

Prior to hearing the testimony of the first witness, defendant Borawski read the charges and plaintiff entered a plea of not guilty to each charge. *Id.* at ¶12. Thereafter, the inmate misbehavior report was read into the record and defendant Mulla, the author of the report was called as the first witness. *Id.* at ¶13. Consistent with standard procedure at Tier hearings, defendant Borawski asked each witness some questions and then plaintiff advised defendant Borawski what questions he would like asked of the witness. *Id.* at ¶14. According to defendant Borawski, he asked every question that plaintiff asked him to ask the witnesses. *Id.* Following defendant Mulla's testimony, plaintiff wished to call defendant Jennings as a witness. Defendant Borawski denied the request because he "did not see how the plaintiff's physical condition after the incident would be relevant to whether or not he engaged in violent, disruptive behavior, and whether he interfered with an employee." *Id.* at ¶18. Plaintiff next requested to have inmate Luther Booker testify as a witness. Inmate Booker refused to testify stating that he did not know anything. *Id.* at ¶19.

7

At the continuation of the Tier III hearing on March 28, 2011, Correction Officer Bryniarski was called to testify.  Dkt. #27-3, pp.24-27.  At the conclusion of Correction Officer Bryniarski's testimony, plaintiff stated that he did not have any questions for him and further stated, "this is not the Officer that I swung, and he's lying, I don't know why he's lying for him, but he's covering up for the other Officer."  Dkt. #27-3, p.27.  Finally, the last witness to testify during the hearing was Sergeant Baker, the B block supervisor on March 22, 2011 on the 3-11 p.m. shift.  According to his testimony, Sergeant Baker responded after the incident and assisted in completing the paperwork. Dkt. #27-3, pp.27-28.  At the conclusion of the witness testimony, defendant Borawski gave plaintiff an opportunity to put any additional information on the record.  At that time, plaintiff offered the following explanation as to how the incident started.  *Id.* at pp.28-32.  As a threshold matter, from the transcript of the hearing it appears that plaintiff believes that it was defendant Mulla, not defendant Bryniarski, who called him out of formation and who pushed plaintiff against the wall.  Dkt. #27-3, pp.26-29. Specifically, plaintiff testified,

| | |
|---|---|
| Inmate Sloane: | Well, I'll tell you how the incident started from the very beginning. |
| Lt. Borawski: | Okay. |
| Inmate Sloane: | All right, from the very beginning.  All right, 22 company was going to chow. |
| | . . . |
| Inmate Sloane: | I stepped out first, there was 4 inmates behind me.  I came downstairs, walked down the stairs, my hands to my side. Okay? |

8

| | |
|---|---|
| Lt. Borawski: | Okay. |
| Inmate Sloane: | Now that Officer just lied, - - - there was another older Officer, |
| Lt. Borawski: | Okay, we've established that was Officer Mulla. |
| Inmate Sloane: | Okay, that Officer that was on the phone, okay, stated, other inmates that was walking toward him, he said, "you" and other inmates stopped, turned around.  He said, "no, not you, you keep going, you."  And he called me from out the line.  I then stepped back and he said "step to the wall."  I step to the right side of the lock box, that goes right to the pipe chase. |
| Lt. Borawski: | Okay, that's what this Officer testified to, that you were between the lock boxes. |
| Inmate Sloane: | Correct, so I'm facing like this against the wall.  The other Officer was there, not this one, Officer Mulla, he started questioning me about my shirt being out my pants.  He said, "didn't I tell you twice about your shirt hanging out your pants."  I said, "yes, but I don't have a belt."  He then said, "what are you stupid?" "That's when this one here, approached me on my left.  Officer Mulla was on my right hand side. |
| Lt. Borawski: | Okay. |
| Inmate Sloane: | Okay, he then asked me, "what you stupid?" I said, "no I'm not stupid."  He then stated, "oh you think you a tough guy?"  I said, "no, why do I gotta be a tough guy?" He then looked at me and he looked at the Officer, he placed his right hand on the back of my neck.  And then he pushed me up against the wall like this. |

9

Lt. Borawski:         Okay.

Inmate Sloane:        Okay, he then asked me again, "was I
                      stupid?" I said, "no, I'm not stupid,
                      Officer."  He then look at this Officer and
                      then there was another third Officer who
                      came, see, I don't know who the third
                      Officer was, but that was the Officer that
                      ran us to chow.  The Officer that was on
                      22 was a young rookie, very young, slick
                      back hair, he was like brown skin.  He
                      came down stairs and he stood on the
                      far left.  So I mean there was [sic] three
                      Officers present.  He then told another
                      Officer, "take him down."  Those was
                      [sic] his exact words, "take him down."
                      That's when they all jumped on me, right
                      there in front of the lock box, between
                      the pipe chase, the lock box.  I then
                      stated, "what did I do?"  That's when
                      they all piled up on me, grabbing my
                      arms and legs, and then started kicking
                      me all on my face, stomping me, and I
                      don't know, somebody cut me, because
                      when I went to the nurse, the nurse
                      asked me did somebody cut me.  I don't
                      know what happened, cuz I went
                      unconscious for a couple of minutes.
                      Okay, they then lift me up off the floor,
                      and more Officers coming, they began
                      stomping and kicking my head.  That's
                      when the blood started gushing out of
                      my head.  Then they took me
                      downstairs and put me against the wall
                      by the clerk's office.

Dkt. #27-3, pp.29-30.

Following plaintiff's testimony offering his explanation of the events of March 22, 2011, defendant Borawski issued his disposition on the record.  Defendant Borawski stated as follows:

> Okay.  I adjourned this hearing in order to render a disposition, and I have.  I have found you guilty of the charges, 104.11 violent conduct, 104.13 creating a disturbance, 107.10 interference, and 100.11 assault on staff.  I took into account the written report and the verbal testimony of Officer Mulla, the testimony of Officer Bernarski [sic], and Sgt. Baker.  Your witness or [sic] Booker has failed to or refused to testify and you did ask for several witnesses, none of which you could provide any information about, so due to the fact that there is no witness testimony and I do not find your version credible, I have found you guilty of these charges.  Bottom line is any type of violent or assaultive behavior towards staff must be severely punished.  The bottom line is you had a lack of opportunity [sic] in that the Officer was not hit.  Just because it was an attempt does not mitigate the factors.  And therefore, this penalty is justified.  The penalty I'm going to give you is 6 months SHU, loss of packages, commissary and phone and recommended good time.  The start date is the date of the incident, 3/22/11, your release date is 9/22/11.  This was a Tier III Hearing, as a result, you do have the right to an appeal.  You have 30 days in which to make an appeal to the Commissioner.  You can get a copy of the appeal form from the Gallery Officers that work up there. Do you understand your appeal rights?

Dkt. #27-3, p.33.  In response to defendant Borawski's question, plaintiff indicated that he understood his appeal rights.

## DISCUSSION AND ANALYSIS

### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(c).  "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a *pro se* plaintiff."  *Thomas v. Irvin*, 981 F. Supp. 794, 798 (W.D.N.Y. 1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see Catanzaro v. Weiden*, 140 F.3d 91, 93 (2d Cir. 1998).  A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see Bryant v. Maffucci*, 923 F.2d 979 (2d Cir.), *cert. denied*, 502 U.S. 849 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of

conjecture or surmise." *Bryant*, 923 F.2d at 982 (internal citations omitted).   A party

seeking to defeat a motion for summary judgment,

> must do more than make broad factual allegations and
> invoke the appropriate statute.  The [party] must also show,
> by affidavits or as otherwise provided in Rule 56 of the
> Federal Rules of Civil Procedure, that there are specific
> factual issues that can only be resolved at trial.

*Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995).


## Denial of Due Process – Tier III Disciplinary Hearing

To state a cognizable § 1983 due process claim, a plaintiff must

demonstrate that he possessed a protected liberty or property interest and that he was

deprived of that interest without due process.  *Bedoya v. Coughlin*, 91 F.3d 349, 351-52

(2d Cir. 1996); *Frazier v. Coughlin*, 81 F.3d 313, 316 (2d Cir. 1996).


### Liberty Interest

"A prisoner's liberty interest is implicated by prison discipline, such as

SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship

on the inmate in relation to the ordinary incidents of prison life.'" *Palmer v. Richards*,

364 F.3d 60, 64 (2d Cir. 2004), *quoting Sandin v. Conner*, 515 U.S. 472, 484 (1995).  In

assessing whether the discipline imposed rises to this level, the Court of Appeals for the

Second Circuit has directed the district courts to consider both the conditions of

confinement and their duration, "since especially harsh conditions endured for a brief

interval and somewhat harsh conditions endured for a prolonged interval might both be

atypical." *Id., quoting Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).  In light of this

13

standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions . . . or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical."  *Id.* at 64-65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship."  *Palmer v. Goss*, No. 02 Civ 5804(HB), 2003 WL 22327110, at * 6 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer v. Richards*, 364 F.3d 60 (2d Cir. 2004); *Smith v. Taylor*, No. 03-0202, 2005 WL 2019547 (2d Cir. Aug. 23, 2005) (determining that 45 days disciplinary confinement in SHU, absent evidence of conditions more onerous than those generally present in the SHU, was insufficient to establish a protected property interest); *Sims v. Artuz*, 230 F.3d 14, 24 (2d Cir. 2003) (vacating dismissal of, *inter alia*, procedural due process claims, stating, during little more than a 4½ month period, Sims was sentenced to SHU for a total of nearly 3½ years); *Durran v. Selsky*, 251 F.Supp.2d 1208, 1214 (W.D.N.Y. 2003), *quoting*, *Tookes v. Artuz*, No. 00CIV4969, 2002 WL 1484391, at * 3 (S.D.N.Y. July 11, 2002) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard*, 215 F.3d 227, 232 (2d Cir. 2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations

14

within the range bracketed by 101 days and 305 days"); *cf. Prince v. Edwards*, No. 99CIV8650, 2000 WL 633382 (S.D.N.Y. May 17, 2000) (suggesting that any period of segregation of one year or less affords no protected liberty interest).  Here, following the Tier III disciplinary hearing, defendant Borawski imposed the following penalties: six months in SHU, loss of commissary, packages and phone and recommended good time.    Thus, there can be no dispute that plaintiff has demonstrated a protected liberty interest.  The issue that remains and that which will be addressed below, is whether plaintiff was deprived of that protected liberty interest without due process.

### Procedural Safeguards

In *Wolff v. McDonnell*, the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied.  418 U.S. 539 (1974).  Specifically, the Supreme Court identified the following procedures:  advance written notice of the claimed violation or charges; a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety.  *Id.* at 563-66.  Moreover, although not specifically required by *Wolff*, plaintiff was provided with an opportunity to appeal each determination and he did in fact exercise that right to appeal on several occasions and with respect to each appeal taken, enumerated specific grounds for his appeal.

15

Plaintiff claims that defendant Borawski violated his Fourteenth Amendment right to procedural due process during the Tier III disciplinary hearing because he was:  denied assistance to prepare for the hearing; denied production of certain witnesses to testify at the hearing; erroneously found guilty of the charges; and was prejudiced by defendant's bias and failure to be impartial.

### Employee Assistance

As discussed above, *Wolff* requires that an inmate be provided with at least 24 hours advance written notice before the hearing "to inform [the inmate] of the charges and to enable him to marshal the facts and prepare a defense." *Wolff*, 418 U.S. at 563-64.   Based on the transcript of the proceedings at the hearing, plaintiff does not dispute that he received the misbehavior ticket on or about March 23, 2011, more than 24 hours before the hearing commenced.  Institutional concerns have generally operated as a bar to inmates obtaining retained or appointed counsel.  *Wolff*, 418 U.S. at 570; *Silva v. Casey*, 992 F.2d 20, 22 (2d Cir. 1993).  Inmates do, however, have a "limited" right to assistance.  *Silva*, 992 F.2d at 22.  Both the Second Circuit case law and DOCS' regulations provide for an inmate to receive employee assistance when that inmate is charged with an offense warranting SHU confinement.  *Silva*, 992 F.2d at 22; *Eng* v. Coughlin, 858 F.2d 889, 898 (2d Cir. 1988); 7 N.Y.C.R.R. § 251-4.1(b).  In his complaint, plaintiff complains that defendant Borawski denied him his right to an assistant."  Dkt. #1, ¶30.  For the following reasons, plaintiff's claim that he was denied an assistant in connection with the Tier III disciplinary hearing which began on March 25, 2011 and concluded on March 28, 2011, must fail as a matter of law.

16

The undisputed evidence before this Court reveals that plaintiff was provided the opportunity to select three possible hearing assistants and rank them in order of preference from a list of eleven.  Dkt. #27-3, p.10.  The form indicates that plaintiff waived his rights to select an assistant and it is noted that plaintiff refused to sign the form.  *Id.*  At the outset of the hearing, plaintiff was asked whether he was given an opportunity to choose an assistant and the hearing officer stated, "and according to this you waived that right and refused to sign.  Uh, Officer Coggiola and witness Officer Blanker signed to that effect on 3/23/11 and also on 10:20 AM. Is that correct?" Dkt. #27-3, p.15.  Plaintiff responded that that was incorrect and in response to the hearing officer's inquiry "well do you wish any assistance or any thing [sic] at this time?" plaintiff responded that he wanted witnesses Sr. Counselor, Sgt. P. Corcoran and the Superintendent.  *Id.*  While it is unclear from the transcript whether plaintiff was requesting those individuals as witnesses or as an assistant, defendant Borawski denied the request.

### Denial of Witness Testimony

In *Wolff v. McDonnell*, the Supreme Court of the United States determined that,

> [an] inmate facing disciplinary proceedings should be
> allowed to call witnesses and present documentary evidence
> in his defense when permitting him to do so will not be
> unduly hazardous to institutional safety or correctional goals.

418 U.S. at 566.  In reaching this conclusion, the Court recognized that,

> [p]rison officials must have the necessary discretion to keep
> the hearing within reasonable limits and to refuse to call

> witnesses that may create a risk of reprisal or undermine
> authority, as well as to limit access to other inmates to
> collect statements or to compile other documentary
> evidence.

*Id.*   In exercising that discretion, prison officials must be able to,

> explain, in a limited manner, the reason why witnesses were
> not allowed to testify, . . . either by making the explanation a
> part of the 'administrative record' in the disciplinary
> proceeding, or by presenting testimony in court if the
> deprivation of a 'liberty' interest is challenged because of
> that claimed defect in the hearing.  In other words, the prison
> officials may choose to explain their decision at the hearing,
> or they may choose to explain it 'later.'

*Ponte v. Real*, 471 U.S. 491, 497 (1985).  A hearing officer may rationally exclude

witnesses or documents when they would be irrelevant or unnecessary to a

determination of the issues in the disciplinary hearing.  *Kalwasinski v. Morse*, 201 F.3d

103, 109 (2d Cir. 1999).  The burden is on the prison official to demonstrate "the

rationality of his position."  *Fox v. Coughlin*, 893 F.2d 475, 478 (2d Cir. 1990).


Plaintiff claims that defendant Borawski denied him witnesses during the

disciplinary hearing.  During the hearing, plaintiff requested Superintendent Bradt and

an unnamed Sr. Counselor as witnesses.  Defendant Borawski denied plaintiff's

requests for Superintendent Bradt and Sr. Counselor explaining that the witnesses

plaintiff may call must have a bearing on the case and must have firsthand knowledge

of the incident, "they have to have been present, they have to have seen it, they have to

have some knowledge of the incident."  Dkt. #27-3, p.16.  Plaintiff claimed that there

were five witnesses to the incident who were behind him on the stairs.  When defendant

Borawski asked him for names, he stated that he did not know the names of the other

inmates.  *Id*. at p.17.  Defendant Borawski stated,

> This is your copy of the witness form, I have refused to uh,
> grant your request, okay.  I have denied your request for
> Superintendant [sic] Bradt on the grounds that he was not
> present for and does not have any personal knowledge of
> this incident.  You've requested five unknown inmates and
> an unknown Officer, and you are not giving me any other
> information as to the identity of these people.  It is your job to
> call your own witnesses, not mine.  You give something, you
> give me information to work with, and I will get them for you.
> Five unknown inmates and an unknown Officer is not
> enough information, so therefore, I'm not doing your leg work
> for you, so that is denied also.

Dkt. #27-3, p.18

       In accordance with the principle set forth in *Wolff v. McDonnell* that a

hearing officer may refuse to call witnesses on the basis of "irrelevance, lack of

necessity, or the hazards presented in individual cases," this Court agrees with

defendant Borawski's determination that both Superintendent Bradt's, Nurse Jennings'

and Sr. Counselor's proposed testimony would have been irrelevant to the issues

presented in the hearing.  Moreover, insofar as plaintiff refused to supply defendant

Borawski with any information concerning the identity of the purported five inmate

witnesses, defendant Borawski was justified in his denial of plaintiff's request.  Finally,

inmate Booker refused to testify on the grounds that he did not know anything.  Based

on the foregoing, this Court concludes that the record contains more than sufficient

evidence to support defendant Borawski's finding of plaintiff's guilt, including, but not

limited to Officer Mulla's testimony and Officer Bryniarski's testimony.

## Impartiality of Hearing Officer

"An inmate subject to a disciplinary hearing is entitled to an impartial hearing officer."  *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996); *see Wolff v. McDonnell* 418 U.S. 539, 570-71 (1974); *Russell v. Selsky*, 35 F.3d 55, 59 (2d Cir. 1994).  An impartial hearing officer  "is one who, *inter alia*, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 569-70 (2d Cir.1990); *Francis v. Coughlin*, 891 F.2d 43, 46 (2d Cir. 1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts."  *Allen*, 100 F.3d at 259; *see Francis*, 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process.").  For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis*, 891 F.2d at 46.  A hearing officer may satisfy the standard of impartiality if there is "some evidence in the record" to support the findings of the hearing.  *Superintendent v. Hill*, 472 U.S. 445, 455 (1985).

Plaintiff alleges that defendant Borawski denied him a fair and impartial hearing.  Dkt. #1, ¶30.  At the conclusion of the disciplinary hearing, plaintiff objected

stating, "Yea, I have an objection and believe that this whole hearing and testimony, nothing but a beefed up incident  I also believe that this is nothing but what you call a mob dominated racist attack against my person, this also for the record, you have a long standing pattern in the Correction Facility of Officers attacking inmates, since I've been here, since I've been on this gallery, there's nothing but inmates being brought up here for so called attempted assaults . . ." Dkt. #27-3, p.33.  Notwithstanding his general objection to the hearing and testimony, plaintiff offers nothing in opposition to the instant motion to support his claim that defendant Borawski denied him a fair and impartial hearing.  The transcript of the disciplinary hearing reveals that defendant Borawski was justified in his denial of plaintiff's request to have five unidentified inmates testify, as well as plaintiff's request for testimony from Superintendent Bradt, Nurse Jennings and Sr. Counselor on the basis that they had no knowledge of the incident.

Plaintiff's bare, conclusory assertion that defendant Borawski denied him a fair and impartial hearing is belied by the evidence in the record before this Court.  The disciplinary hearing spanned over two days, including the testimony of the two Correction Officers involved in the incident and Sergeant Baker.  Inmate Booker, the only inmate witness identified by plaintiff, refused to testify stating that he did not know anything.  Finally, prior to rendering his decision, defendant Borawski heard plaintiff's testimony concerning the incident.

As reflected in the disciplinary hearing transcript and memorialized on the Superintendent Hearing Disposition Rendered Forms, defendant Borawski permitted

plaintiff to voice his objections during the hearing, afforded plaintiff the opportunity to testify or to present evidence in his defense, and set forth sufficient evidence in his disposition to support his determination of guilt.  Specifically, defendant Borawski states that he relied upon the written report and verbal testimony of Correction Officer Mulla, the verbal testimony of Correction Officer Bryniarski and Sergeant Baker.  In addition, defendant Borawski further states that his decision was, in part, based on the failure of inmate Sloane's witness to testify and inmate Sloane's failure to present a credible defense against the charges.  Dkt. #27-3, p.8.  As reflected in the transcript of the disciplinary hearing, defendant Borawski imposed the following penalty, "6 month SHU, loss of packages, commissary and recommended good time."  Dkt. #27-3, p.33.

Here, plaintiff's bare, conclusory allegations of bias and prejudgment, without more, are insufficient to defeat defendant's motion for partial summary judgment.  As reflected in the Hearing Disposition Sheet and hearing transcript, defendant Borawski based his determination on the Misbehavior Report, the testimony of plaintiff, testimony of witnesses present during the incident, and the documentary evidence.  Additionally, as noted above, defendant Borawski's decision was based, in part, on plaintiff's failure to present a credible defense.  Thus, the record before this Court unequivocally establishes that defendant Borawski was neither biased nor prejudged the evidence.  To the contrary, defendant Borawski based his finding of guilt on the credible evidence presented during the hearing and made an objectively reasonable determination based on the evidence.  Thus, the Court agrees with

defendant Borawski that plaintiff has failed to meet his burden of demonstrating that

defendant Borawski was so partial so as to violate plaintiff's due process rights.

## False Misbehavior Report

As set forth above, the Inmate Misbehavior Report relative to the March

22, 2011 incident was prepared by defendant Correction Officer Mulla.  Dkt. #27-3, p.9.

Plaintiff Sloane was charged with the following violations:  100.11 attempted assault;

104.11 violent conduct; 104.13 disturbing the order of the facility, 107.10 interference

with an employee.  Dkt. #27-4, p.5.  In the Inmate Misbehavior Report, defendant Mulla

described the incident as follows:

> On the above date and approximate time inmate Sloane
> 07A1140 came down the stairs with the 22 co. inmates going
> to chow.  He had both of his hands in his pockets and C.O.
> Bryniarski ordered him to step out of the line.  As C.O.
> Bryniarski began to talk to him he swung at C.O. Bryniarski
> with his right hand in a closed fist.  At this time it became
> necessary to use force.  (See use of force report)
> Inmate Sloane was then escorted to the infirmary by
> uninvolved staff with no further incident.

Dkt. #27-4, p.5.

The Second Circuit has held that "a prison inmate has no general

constitutional right to be free from being falsely accused in a misbehavior report."

*Boddie v. Robinson*, 105 F.3d 857, 862 (2d Cir. 1997).  However, an allegation that a

prison official filed false disciplinary charges in retaliation for the exercise of a

constitutionally protected right, such as the filing of a grievance, does state a claim

under § 1983. *Franco v. Kelly*, 854 F.2d 584, 589-90 (2d Cir.1988). A plaintiff alleging

23

retaliatory punishment "bears the burden of showing that the conduct at issue was constitutionally protected and that the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir.1996). The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation. *Id.* at 80. The defendant can meet this burden by demonstrating that there is no dispute that the plaintiff "committed the most serious, if not all, of the prohibited conduct charged in the misbehavior report." *Hynes v. Squillace*, 143 F.3d 653, 657 (2d Cir.) (per curiam), *cert. denied*, 525 U.S. 907 (1998); *see also Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir.1994) (holding that the defendants met their burden when "it was undisputed that [the plaintiff] had in fact committed the prohibited conduct").

To prove that retaliation was the motivating factor behind the adverse action, the plaintiff must present facts supporting an inference of a causal connection between the adverse actions and the protected conduct. *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds, Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002). In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *See Colon*, 58 F.3d at 872.  Here, neither plaintiff's complaint nor his opposition to the instant motion offers any facts to support his conclusory allegation that defendant Mulla

24

drafted a false misbehavior report in retaliation for some constitutionally protected

conduct.   Accordingly, defendant's motion for summary judgment on that claim is

granted.


**Excessive Use of Force**

Plaintiff claims that defendants, Correction Officer Mulla and Correction

Officer Bryniarski, used excessive force against him in violation of the Eighth

Amendment prohibition against cruel and unusual punishment.   Dkt. #1, ¶¶9-10.

That rule, applicable to the states through the Fourteenth Amendment, *see Estelle v.*

*Gamble*, 429 U.S. 97, 101-02 (1976), is violated by the unnecessary and wanton

infliction of pain and suffering. *See Whitley v. Albers*, 475 U.S. 312, 320 (1986). In

assessing an inmate's claims that prison officials subjected him to cruel and unusual

punishment by using excessive force, courts must determine whether the prison officials

acted "in a good-faith effort to maintain or restore prison discipline, or maliciously and

sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).


To prove an excessive force claim, an inmate must satisfy both an

objective test and a subjective test. *Hudson,* 503 U.S. at 7-8.   Objectively, a section

1983 plaintiff must establish that the force applied was "sufficiently serious" or harmful

to establish a constitutional violation. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)

(quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (additional citations omitted); *see*

*also Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir. 1993). This objective component is

"contextual and responsive to 'contemporary standards of decency.'" *Hudson*, 503 U.S. at 9.  A plaintiff "need not prove 'significant injury to make out an excessive force claim," *Griffin v. Crippen*, 193 F.3d 89, 92 (2d Cir. 1999), but "a *de minimis* use of force will rarely suffice to state a constitutional claim." *Romano*, 998 F.2d at 105. *De minimis* force, even if clearly unpleasant to endure, does not violate the Eighth Amendment where "the use of force is not of a sort repugnant to the conscience of mankind." *Hudson*, 503 U.S. at 9-10 (internal quotation marks and citation omitted).  Although "some degree of injury is ordinarily required to state a claim," *United States v. Walsh*, 194 F.3d 37, 50 (2d Cir. 1999), the core judicial inquiry is not the extent of the injury sustained, but rather "'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.'" *Wilkins v. Gaddy*, -- U.S. --, 130 S.Ct. 1175, 1179 (2010) (quoting *Hudson*, 503 U.S. at 7).

         The subjective test for an Eighth Amendment excessive force claim requires the inmate to show that the prison officials "had a 'wanton' state of mind when they were engaging in the alleged misconduct." *Davidson v. Flynn*, 32 F.3d 27, 30 (2d Cir. 1994) (citing *Hudson*, 503 U.S. at 7). When determining whether the subjective test has been satisfied, courts may consider, "the need for application of force, the relationship between that need and the amount of force used, the threat 'reasonably perceived by the responsible officials' and 'any efforts made to temper the severity of a forceful response.'" *Hudson*, 503 U.S. at 7 (quoting *Whitley*, 475 U.S. at 321). "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Id.*

Here, plaintiff claims that he was maliciously attacked by defendants Bryniarski and Mulla.  Plaintiff further claims that he suffered a "(1) head busted, (2) left eye cut open, eyebrow over my left eye, (3) under my chin cut open, (4) both hands numb, devoid of sensation esp., (5) left-side ribs broken, (6) right lower ankle bone fracture, (7) lower rightside back injured."  Dkt. #1, ¶10.  A Use of Force Report was prepared by defendant Nurse Jennings, wherein she described plaintiff's injuries and the treatment she provided as follows:  "Injury #1: 2½ inch laceration to top of left head, cleansed with sterile water, (8) steri-strips and dermaband applied. #2: ½" laceration to left eye brow, cleansed with sterile water, (4) steri-strips and dermaband applied. #3: left chin with small abrasion – cleansed.  Inmate alert, cognitively stable; steady gait with ambulation."  Dkt. #27-5, p.5.

Defendants argue that their use of force was justified and plaintiff suffered only *de minimis* injury and further, he received the proper medical care.

Defendants maintain that plaintiff can satisfy neither the objective nor subjective elements of an excessive use of force claim.  Indeed, defendant Jennings stated that her examination revealed no injuries that needed further medical attention at that time.  Moreover, according to the defendants, the photographs taken immediately after the use of force support the contention that none of plaintiff's injuries were sufficiently serious.  With respect to the subjective element, the defendants assert that the force applied by defendants Bryniarski and Mulla was not done with malicious or sadistic intent to cause plaintiff harm.  More specifically, defendants claim that the minimal amount of force was used to control the situation and maintain order.

Notwithstanding the foregoing, the parties disagree substantially as to how the alleged

incident unfolded.  Specifically, plaintiff maintains that as he was walking to the mess

hall, Correction Officer Mulla and Correction Officer Bryniarski told him to place his

hands on the wall and then began to yell at him, slam his head into the wall and kick,

punch and hit him with sticks.  Plaintiff further claims that after a bell sounded, more

unidentified correction officers came running, took him downstairs, and "jump[ed] him

again."  Dkt. #1, ¶¶9-10.  In sharp contrast, defendants maintain that as plaintiff was

lining up for "chow," defendant Bryniarski ordered plaintiff to step out of line because he

had both hands in his pockets.  Dkt. #27-4, ¶5.  Defendant Bryniarski asserts that "as

[he] began to talk to the plaintiff, he [plaintiff] then turned, unprovoked, and swung to

punch me with his closed right fist."  *Id.*  It was at that point that defendant Bryniarski,

assisted by defendant Mulla, used force to subdue plaintiff.


        The Court recognizes that plaintiff's proof of his injuries and of the

excessive force incident itself may be weak.  Nonetheless, if "a prisoner's allegations

and evidentiary proffers could reasonably, if credited, allow a rational factfinder to find

that corrections officers used force maliciously and sadistically," summary judgment is

improper "even where the plaintiff's evidence of injury [is] slight and the proof of

excessive force [is] weak."  *Wright v. Goord*, 554 F.3d 255, 269 (2d Cir. 2009).

Crediting plaintiff's version of events, as this court must in considering the defendants'

motion for summary judgment, *Dallas Aerospace, Inc. v. CIS Air Corp.*, 352 F.3d 775,

780 (2d Cir. 2003), there is a question of fact whether the use of force was unrelated to

any effort to maintain order or discipline.  *See Clarke v. Anderson,*  2012 WL 3292879

(W.D.N.Y. August 10, 2012) (despite no visible injuries, summary judgment denied where plaintiff alleged that he was victim of unprovoked assault); *Abascal v. Fleckenstein*, 2012 WL 638977, *6 (W.D.N.Y. February 27, 2012) (despite minor injury, summary judgment denied where plaintiff alleged that CO committed brief but unprovoked assault unrelated to any effort to maintain or restore discipline); *see also Griffin v. Crippen*, 193 F.3d at 90–92 (although plaintiff could offer only his own testimony and evidence of a bruised shin and a swollen left knee in support of his excessive force claim, dismissal was inappropriate because there were genuine issues of material fact concerning whether correction officers, whom plaintiff admittedly assaulted, maliciously used force against him after he was subdued and handcuffed); *Jordan v. Fischer*, 773 F.Supp.2d 255, 272 (N.D.N.Y. 2011) (although plaintiff suffered only minor injury, summary judgment denied where excessive force claims turned on issues of credibility).  In so concluding, this court expresses no view on the underlying merits of plaintiff's claim, but notes only that, if successful, "the relatively modest nature of his alleged injuries will no doubt limit the damages he may recover." *Wilkins,* 130 S.Ct. at 1180.  Accordingly, the defendants' motion for summary judgment dismissing the excessive force claim is denied.


**Deliberate Indifference to Serious Medical Needs**

In *Estelle v. Gamble*, the United States Supreme Court determined that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' proscribed by the Eighth Amendment" to the United States Constitution.  429 U.S. 97, 104 (1976).  To establish an unconstitutional

denial of medical care that rises to the level of an Eighth Amendment violation, a prisoner must prove, beyond mere conclusory allegations, that the defendant acted with "deliberate indifference to [his] serious medical needs." *Estelle*, 429 U.S. at 104.  More specifically, the prisoner must demonstrate both that the alleged deprivation is, in objective terms, "sufficiently serious," and that, subjectively, the defendant is acting with a "sufficiently culpable state of mind." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994), *cert. denied*, 513 U.S. 1154 (1995).  Both the objective and subjective components must be satisfied in order for a plaintiff to prevail on his claim.  *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996).

Under the objective component, in assessing whether a medical condition is "sufficiently serious," the Court considers all relevant facts and circumstances, including whether a reasonable doctor or patient would consider the injury worthy of treatment; the impact of the ailment upon an individual's daily activities; and, the severity and persistence of pain.  *See Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).  A serious medical condition exists where the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  *Id.*  The alleged deprivation must be "sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists."  *Hemmings v. Gorczyk*, 134 F.3d 104, 108 (2d Cir. 1998).  "[I]n most cases, the actual medical consequences that flow from the alleged denial of care will be highly relevant to the question of whether the denial of treatment subjected the prisoner to a significant risk of serious harm."  *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

Where the claim is that the care provided was inadequate, plaintiff must demonstrate that, as an objective matter, the alleged deprivation of adequate medical care was sufficiently serious, *i.e.*, that he "was actually deprived of adequate medical care." *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006).  In making this determination, courts assess whether the inadequacy in medical care is sufficiently serious, *i.e.*, "how the offending conduct is inadequate and what harm, if any, the inadequacy has caused or will likely cause the prisoner."  *Id.* at 280.

The subjective component for a claim of deliberate indifference to a serious medical need requires that the plaintiff establish that the defendant acted with a "sufficiently culpable state of mind" so as to violate the Eighth Amendment's cruel and unusual punishment clause.  *Wilson v. Seiter*, 501 U.S. 294, 298 (1991).  "[A] prison official does not act in a deliberately indifferent manner unless that official 'knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" *Hathaway*, 37 F.3d at 66, *quoting Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  In *Estelle*, the Supreme Court ruled that deliberate indifference may manifest itself in a doctor's refusal to administer needed treatment, a prison guard's intentional denial or delay in granting an inmate access to medical care, or intentional interference with prescribed treatment.  *Estelle*, 429 U.S. at 104-05.

"The subjective element of deliberate indifference 'entails something more than mere negligence . . . [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.'" *Hathaway*, 99 F.3d at 553, *citing Farmer v. Brennan*, 511 U.S. 825 (1994); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003), *cert. denied*, 543 U.S. 1093 (2005).  The Supreme Court further stated in *Estelle* that, "an inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'"  *Estelle*, 429 U.S. at 105-06.  Thus, the Supreme Court added,

> [a] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment.  Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.  In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs.

*Id.* at 106; *see also Chance*, 143 F.3d at 703 ("[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation").  Indeed,

> it is well-established that mere disagreement over the proper treatment does not create a constitutional claim.  So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.

*Chance*, 143 F.3d at 703.  Thus, "a delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that treatment is unreliable, or that the cure is as risky or painful or bad as the malady" will not constitute

deliberate indifference.  *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000).

However, "[p]rison officials are more than merely negligent if they deliberately defy the

express instructions of a prisoner's doctors."  *Gill v. Mooney*, 824 F.2d 192, 196 (2d Cir.

1987).

Here, plaintiff's allegations do not meet the objective component of an

Eighth Amendment violation. Defendant Jennings saw plaintiff after the use of force

incident on March 22, 2011, and described plaintiff's injuries as follows, "Injury #1: 2½

inch laceration to top of left head, cleansed with sterile water, (8) steri-strips and

dermaband applied. #2: ½" laceration to left eye brow, cleansed with sterile water, (4)

steri-strips and dermaband applied. #3: left chin with small abrasion – cleansed.  Inmate

alert, cognitively stable; steady gait with ambulation."  Dkt. #27-5, p.5.  Such injuries do

not, as a matter of law, rise to the level of a "serious medical condition" warranting

Eighth Amendment protection. *See Davidson v. Scully*, 914 F.Supp. 1011, 1015

(S.D.N.Y.1996) (plaintiff's combined allegations of an eye condition, tinnitus, allergies,

podiatric and knee injuries, post-surgery hernia condition, urological, dermatological and

cardiological problems did not amount to a sufficiently serious injury); *Pabon v. Goord*,

No. 99 Civ. 5869(THK), 2003 WL 1787268, *4 (S.D.N.Y. March 28, 2003) (clival lesion

at the base of the inmate's skull not sufficiently serious); *Rodriguez v. Mercado*, No. 00

CIV. 8588 JSRFM, 2002 WL 1997885, *8 (S.D.N.Y. Aug. 28, 2002) (bruises to head,

back, and wrists not sufficiently serious); *Sonds v. St. Barnabas Hosp. Corr. Health

Servs.*, 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (bleeding finger not a severe injury);

*Henderson v. Doe*, No. 98 Civ. 5011, 1999 WL 378333, *2 (S.D.N.Y. June 10, 1999)

(broken finger not severe).  In his complaint, plaintiff alleges injuries in addition to those documented by defendant Jennings, including broken ribs, an ankle fracture and a "lower right-side back injury."  Dkt. #1, ¶10.  Neither plaintiff's medical records, nor any of the reports following the March 22, 2011 incident suggest any injuries other than those described and treated by defendant Jennings.  Indeed, plaintiff offers no elaboration on his broken ribs, ankle fracture and lower right-side back injury.  Even assuming that those injuries were ignored by defendant Jennings, which is not evident in the record before the Court, plaintiff cannot meet the objective component of an Eighth Amendment violation.  With respect to the subjective component, plaintiff was seen and treated by defendant Jennings and the medical records support that conclusion.  Plaintiff has thus not presented any evidence to raise a material issue of fact of deliberate indifference, and therefore it is recommended that defendant's motion for summary judgment on this claim be granted.

## CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment (Dkt. #27) is granted in part and denied in part.


**SO ORDERED.**

DATED:     Buffalo, New York
           December 4, 2014


_s/ H. Kenneth Schroeder, Jr._
**H. KENNETH SCHROEDER, JR.**
**United States Magistrate Judge**